UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

IN RE:   DIE TECH SERVICES, INC., a    Case No.: 19-00835
         Michigan corporation,          (Chapter 11)
                                        Hon.
                Debtor.            /

### DECLARATION OF KELLY C. DARBY

I, Kelly C. Darby, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the President and Secretary of Die Tech Services, Inc. ("Die Tech" or "Debtor"). I submit this Declaration of Kelly C. Darby ("Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled Die Tech to commence its chapter 11 case and in support of (i) the Debtor's Petition for Relief Under Chapter 11 of the United States Code (the "Bankruptcy Code"), and (ii) the relief requested by the Debtor pursuant to various motions filed in this case.

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of Die Tech's senior management, my review of relevant documents, or my opinion based upon my experience, knowledge and information concerning the Debtor's operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. The Debtor has authorized me to submit this Declaration on its behalf.

3. I have been employed by Die Tech since March of 2002. I have been President of Die Tech since January of 2009. As President, I am familiar with the day to day operations, businesses and financial affairs of the Debtor. The Debtor will continue to operate its

MJ_DMS 30506156v6 2229-5

business and manage its affairs as Debtor and debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

4. I have reviewed the Petition for Relief and all related documents and the Initial Motions (defined below) filed in this case and affirm that the facts set forth in those documents are true and correct to the best of my knowledge.

## BACKGROUND

### Corporate Structure & Ownership

5. Die Tech is privately owned. Die Tech provides contracted skilled labor to manufacturing companies through the United States and abroad and performs some tool and die manufacturing in a single leased facility. Die Tech is a Michigan "S" corporation" and is headquartered in Walker, Michigan.

6. I own 60% of the outstanding shares of the Debtor, and Ronald Bourque, the Vice President and Treasurer, owns 40% of the outstanding shares of the Debtor. Ronald Bourque and I are the only directors of the Debtor.

7. Ronald Bourque and I each also own a 50% interest in DTS Holding, LLC ("DTS"), and serve as officers and directors of DTS. DTS owns the property and building at 2457 Waldorf Court NW, Walker, Michigan 49544 (the "Facility"), which Die Tech is leasing and in which Die Tech operates. DTS has no operations, and is solely a real estate holding company.

### Business Operations

8. Die Tech was founded in 2002 as a service company, providing contracted, qualified skilled labor to manufacturing companies throughout the United States and abroad on an as-needed basis. Die Tech works with original equipment manufacturers and Tier 1 and Tier 2 suppliers, primarily providing temporary, high-skilled tool and die makers to address

2

customers' urgent, short-term needs. Die Tech's staff is experienced in die stamping, buyoff procedures, engineering changes, consulting and managing projects.

9. In 2009, Die Tech expanded its services from specialized skilled labor to include the manufacturing of "inspection fixtures and gages." In recent years, Die Tech further expanded its services to include consulting, worldwide die sourcing and engineering, project management, fixture builders, mold makers, and machine builders.

10. In 2011, Die Tech added a "Special Machines" division to its business. The Special Machines division develops, designs and builds custom tooling to fit customers' specific needs.

11. Die Tech does not own any real estate, and leases the Facility from DTS pursuant to a Lease dated August 3, 2015. DTS is in the process of selling the Facility in order to pay down the debt owed by Die Tech and DTS to Byline Bank (as further described below).

**Employees**

12. Die Tech employs 20 full-time employees. Die Tech has no part-time employees. Die Tech's employees are not unionized. Employees are paid on a bi-weekly basis in arrears, and some employees are salaried while others are paid on an hourly basis. Die Tech handles its payroll internally.

13. Die Tech provides health, dental, life and short term disability insurance benefits to its employees. Die Tech also offers a non-matching 401K plan to all employees, paid vacation and eight paid holidays.

**Debt Structure**

14. Die Tech estimates that, in the aggregate, it has approximately 98 creditors, including active employees.

15. Die Tech's primary creditor is Byline Bank, an Illinois banking corporation ("Byline Bank"). Die Tech's obligations to Byline Bank total approximately $2.2 million and are secured by all assets of Die Tech and DTS. Based on valuations obtained by the Debtor, the debts owed to Byline Bank far exceed the value of all assets which secure said debts. Additionally, Die Tech owes tax obligations to the Internal Revenue Service ("IRS") and the State of Michigan in the approximate amount of $480,000.00. Although the IRS and the State of Michigan have filed tax liens against all of the Debtor's assets, the liens are subordinate to the Byline Bank liens. Therefore, Debtor asserts that the taxing authorities do not have an interest in Debtor's Cash Collateral. Die Tech's unsecured trade debt totals approximately $546,400.00.

16. Die Tech's secured debt is comprised primarily of obligations owing under a Loan Agreement (the "Prepetition Loan Agreement") dated as of March 15, 2018 by and between Die Tech, DTS and Byline Bank and related loan documents (the "Prepetition Loan Documents"). As of the Petition Date, the aggregate amount owing under and in respect of the Prepetition Loan Documents was approximately $2,260,000 (the "Prepetition Loan Obligations"). The Prepetition Loan Obligations are secured by a first priority security interest in all assets of Die Tech.[1] In December of 2018, due to cash flow issues, Die Tech requested forbearance of the loan from Byline Bank, and Byline Bank agreed to defer all loan payments due from Die Tech and/or DTS under the Prepetition Loan Documents for three months.

**Out of Court Restructuring and Marketing Efforts**

17. In late 2016, Chemical Bank stopped sending Die Tech statements for equipment loans and shortly after that they froze the line of credit and asked Die Tech to look for a new bank, resulting in defaults by Die Tech under its previous loans with Chemical Bank, its

---

[1] DTS is a co-obligor on the Prepetition Loan Obligations. The Prepetition Loan Obligations are also secured by a first priority security interest in all business assets of DTS and a first priority mortgage lien on the Facility.

4

then-primary lender. Additionally, at the time, Die Tech's monthly debt load from certain other high interest loans was putting a strain on Die Tech's ongoing cash position. Therefore, in early 2017, Die Tech began shopping for a refinancing lender, which refinancing was ultimately provided by Byline Bank in March of 2018.

18. At the time of Die Tech's application for a refinancing transaction with Byline Bank, Die Tech had approximately $5 million of purchase orders from customers for manufacturing work, but because the refinancing with Byline Bank took almost one year to complete, during which time Die Tech struggled to fund the purchase of sufficient raw materials to fulfill purchase orders, roughly $1 million of work was pulled by customers and resourced to other manufacturers. Unfortunately, Die Tech has not been successful in replacing the lost manufacturing work, resulting in additional operating losses and general liquidity constraints impacting Die Tech's operations. Therefore, within less than one year of executing the Prepetition Loan Documents, Die Tech was forced to request forbearance of the loan from Byline Bank.

19. As a result, in January 2018, Die Tech engaged DWH, LLC to assist Die Tech in analyzing its business, developing a plan to restructure its finances, and exploring sale and other restructuring alternatives.

20. Meanwhile, the performance of Die Tech's manufacturing business continued to deteriorate. In January 2019, Die Tech, DTS and their management team engaged investment bank, broker and advisor Invictus Mergers and Acquisitions ("Invictus") to evaluate the business and to propose other potential strategies, including but not limited to, sale of Die Tech as a going concern and/or sale of the Facility to pay down the Prepetition Loan Obligations.

21. Invictus immediately evaluated Die Tech's business operations, historical financial performance, and financial projections. Based on its review of the business, Invictus began contacting potential buyers to gauge interest in the market place regarding the sale of Die Tech as a going concern. Concurrently, Invictus also began marketing the Facility for sale.

22. Based on these efforts, in February of 2019, DTS received four (4) separate offers for the Facility.

23. Ultimately, the board of directors of Die Tech and DTS authorized the sale of the Facility in order to pay down the Prepetition Loan Obligations and enable Die Tech to reduce its lease obligation by downsizing to a smaller operational space.

24. Sale of the Facility is currently pending, and scheduled to close no later than May of 2019. Sale of the Facility is expected to reduce the Prepetition Loan Obligations by approximately $1 million.

25. In conjunction with the sale of the Facility, Die Tech will cease all onsite design and manufacturing work and limit its operations to providing contract labor to its customers. This should allow Die Tech to significantly reduce overhead expenses and return to profitability.

**Initial Motions**

26. To minimize the adverse effects of the commencement of its chapter 11 case on its business and employees, the Debtor has filed several "Initial Motions" including those listed below.

- *Motion for Order Under 11 U.S.C. §§ 363, 1107 and 1108 Authorizing the Maintenance of Existing Bank Accounts, Continued Use of Existing Business Forms, and Maintenance of Existing Cash Management System* (the "Cash Management Motion");

- *Motion for Entry of An Order (A) Deeming Utilities Adequately Assured of Future Performance And (B) Establishing Procedure for Determining Adequate Assurance Pursuant to § 366 of The Bankruptcy Code* (the "Utilities Motion");

- *Motion for Ex Parte Order Approving Payment of Employee Obligations, Including, (A) Payment of Pre-Petition Wages, Salaries and Other Compensation, (B) Payment of Employee Benefits and Employee Taxes, and (C) Authorizing and Directing Banks to Honor Pre-Petition Payroll Checks and Other Employee Obligations* (the "Employee Wages Motion"); and

- *Debtor's Motion for Order Authorizing Debtor to Use Cash Collateral Pending a Final Hearing, Granting Adequate Protection to Byline Bank, and Scheduling a Final Hearing* (the "Cash Collateral Motion").

27. I have reviewed the Initial Motions to confirm that the facts set forth therein are true and correct to the best of my knowledge although in some instances I will rely upon information provided by Die Tech's senior management team with respect to certain prepetition dollar amounts in the Initial Motions. I believe that the relief requested in each of the Initial Motions is necessary, appropriate and is in the best interest of the Debtor's estate, creditors and other parties in interest.

A.    **Cash Management Motion**

28. As noted in the Cash Management Motion, Debtor utilizes in the ordinary course of business a centralized cash management system (the "Cash Management System") commonly used by comparably sized companies to collect, transfer, concentrate, and disperse funds.

29. In the Cash Management Motion, Debtor asks the court to (a) authorize it to maintain its existing bank accounts, checks, and business forms without being required to close such accounts and forms and reopen new ones, (b) to authorize Debtor to continue using its

7

centralized Cash Management System, and (c) authorize Debtor's bank to accept and rely upon Debtor's notices and instructions as to which prepetition checks can be honored pursuant to any orders entered by this Court.

30. Debtor's Cash Management System, or a similar variation of it, has been employed by Debtor for some time and constitutes an essential business practice. It allows Debtor to control and monitor its corporate funds, to ensure cash availability and to reduce administrative expenses by facilitating the movement of funds. The closure and reopening of such accounts and systems would be costly to Debtor, disruptive to its operations and potentially damaging to its business relations with customers, vendors and employees.

**B.     Utilities Motion**

31. Die Tech has agreements with at least 9 utility companies for the provision of electric, gas, water sewer, telephone, waste management, internet, and similar utility services. Die Tech is current with all such utility companies. Any interruption of utility service would severely disrupt and diminish Die Tech's chance for a successful reorganization. Accordingly Die Tech requests the court to enter an order (a) prohibiting the utility companies from altering or discontinuing utility services based upon the chapter 11 filing, (b) authorizing the Debtor to make deposits on account of services provided by utility companies, and (c) establishing procedures as described in Utilities Motion for determining request for assurance of payment.

**C.     Employee Wages Motion**

32. In the ordinary course of its business Debtor incurs payroll obligations to its employees (the "Employees"). Through the Employee Wages Motion, Debtor seeks authority to pay certain prepetition obligations owing with respect to the employees but not yet paid as of the Petition Date. These include:

      a. Wages, salaries, holiday, and other similar forms of earned, compensation (the "Salaries and Wages").

      b. Deductions collected by Debtor from Employees' paychecks but not yet paid by Debtor for the purposes of (i) income tax withholdings, (ii) employee contributions towards the 401(k) savings program, (iii) insurance premiums relating to certain health benefit plans and (iv) certain garnishments, child support, and other employee wage deduction orders (collectively, the "Prepetition Deductions").

      c. Monetary obligations owed by Debtor with respect to certain employee benefit programs, including health, dental, 401(k) retirement plans, and life and disability insurance for its Employees and other similar programs (collectively, the "Prepetition Benefits").

33. Debtor's records indicate that the amount of Salaries and Wages and Prepetition Benefits owing to or on account of any one particular employee will not exceed the sum of $12,850 allowable as a priority claim under sections 507(a)(4)(a)(5) of the Bankruptcy Code.

34. Granting the relief requested in the Employee Wages Motion will help ensure the uninterrupted delivery of the Employee services to Debtor as well as help create normality and aid in the Debtor maintaining a "business as usual" atmosphere. To the extent that prepetition obligations owed to Employees, if any, are not honored, I believe that the Debtor faces the risk that its operations and customer relations may be jeopardized through reduced Employee morale and possible attrition.

**D.   Cash Collateral Motion**

35. As noted in the Cash Collateral Motion, Byline Bank has a first priority security interest in all assets of Die Tech, including cash collateral. By the Cash Collateral Motion, Debtor is requesting interim authorization to use cash collateral pending a final hearing, and adequate protection to Byline Bank, pursuant to an interim budget, which is attached to the

Cash Collateral Motion as Exhibit B ("Interim Budget") until the conclusion of the final hearing on Debtor's Cash Collateral Motion or the date on which the interim order becomes final.

36. The Debtor must maintain sufficient access to cash to continue to operate its business as a going concern for the direct benefit of all stakeholders and to develop and implement its plan to reorganize. It is, therefore, essential to the success of the Debtor's chapter 11 case that the Debtor immediately obtain authority to use cash collateral. The preservation of estate assets, the Debtor's continuing viability, and Debtor's ability to maximize value for stakeholders successfully depends heavily upon the expeditious approval of the relief requested in the Cash Collateral Motion.

37. It is my belief that the failure to obtain the relief requested in the Cash Collateral Motion will cause immediate and irreparable harm to the Debtor's estate, as the Debtor will be unable to continue operating, which will cause significant diminution in value of the Debtor's business and assets.

## CONCLUSION

38. I believe the relief sought in the Initial Motions is necessary for Debtor to effectuate a smooth transition into chapter 11, to avoid irreparable harm to its business and estate and is in the best interests of the Debtor's creditors, estate, and other stakeholders.

39. Accordingly, for the reasons stated herein and in each of the Initial Motions, I respectfully request that each of the Initial Motions be granted in their entirety, together with such further relief as the court may deem just and proper.

[SIGNATURE ON FOLLOWING PAGE]

I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: March 5, 2019

Kelly C. Darby